IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| *ex rel.,* Carol Foulds, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | JURY TRIAL DEMANDED |
| ABRY PARTNERS LLC, CANDESCENT | ) | |
| PARNTERS, DERMATOLOGY & | ) | |
| SKIN CANCER CENTERS, US | ) | |
| DERMATOLOGY PARTNERS, *et al*. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>VERIFIED COMPLAINT</u>

Plaintiff, brought on behalf of the United States of America by Relator against Abry

Partners ("AP"), Candescent Partners ("CP"), Dermatology & Skin Cancer Centers ("DSCC"),

US Dermatology Partners ("USDP"), Oliver Street Dermatology Management LLC ("OSDM"),

Dr. Mark Fleischman, MD ("Dr. Fleischman"), Dr. Glenn Goldstein, MD ("Dr. Goldstein"),

Shawn Sabin, MD ("Dr. Sabin"), Karen Neubauer, DO ("Dr. Neubauer"), Julie S. Green, MD

("Dr. Green"), and Dr. Elizabeth Spenceri ("Dr. Spenceri") for its Complaint against Defendants

AP, CP, DSCC, USDP, OSDM, Dr. Fleischman, Dr. Goldstein, Dr. Sabin, Dr. Neubauer, Dr.

Green, and Dr. Spenceri hereby states as follows:

## <u>INTRODUCTION</u>

This is a civil qui tam action brought on behalf of the United States of America by

Relator against AP, CP, DSCC, USDP, OSDM, Dr. Fleischman, Dr. Goldstein, Dr. Sabin, Dr.

Neubauer, Dr. Green, and Dr. Spenceri subject to the qui tam provisions of the Civil False

Claims Act and pursuant to 31 U.S.C. §§ 3729-33.

1

1.      USDP provides dermatological services to patients, including Mohs surgery, a technique for excising skin cancers.  DSCC is a partner of USDP and provides the same type of dermatological services to patients.  OSDM owns USDP and bills on behalf of USDP.

2.      Defendants USDP and DSCC used an irregular protocol of transferring patients who had undergone Mohs surgery from an outpatient exam room located in the Ambulatory Surgery Center ("ASC") to an ASC room located in the ASC in the same building to receive higher reimbursement from Government funded healthcare payors, including Medicare and Tricare.  These ASCs were not compliant with Government regulations and the ASC Mohs exam rooms were no different then normal exam rooms.

3.      Transfer to an ASC for the purpose of surgical repairs only was not medically necessary and needlessly drove up the cost of care for Government insurance payors. Furthermore, the rooms used as ASCs were arranged and used in a "mixed" capacity as both exam rooms and ASCs, in violation of CMS regulations.  Defendants falsely certified compliance with CMS regulations regarding ASCs.

4.      Defendants also performed and billed for medically unnecessary Mohs surgeries when simple surgical excisions were implicated, resulting in overpayment by Government payors.

5.      Defendants performed medically unnecessary complex repairs routinely when intermediate or simple repairs were implicated and falsified medical records and billing forms by upcoding for complex repairs, which are more expensive than simple or intermediate repairs. This resulted in the defrauding of Government funded healthcare programs, including Medicare and Tricare.

2

6. Additionally, Defendants falsely reported compliance with Electronic Health Record ("EHR") standards under Meaningful Use and MIPS by losing years of patient medical records during a server crash, making it impossible for Defendants to provide patients with their EHRs on request or to give outside providers these records. By falsely reporting compliance, Defendants received higher reimbursement from Medicare and avoided potential penalties.

## THE PARTIES

7. Relator brings this action on behalf of the United States of America against AP, CP, DSCC, USDP, Dr. Fleischman, Dr. Goldstein, and Dr. Spenceri for treble damages and civil penalties arising from AP, CP, DSCC, USDP, Dr. Fleischman's, Dr. Goldstein's, Dr. Sabin's, Dr. Neubauer's, Dr. Green's and Dr. Spenceri's false statements and false claims in violation of the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* The violations arise out of false billing and record practices, paid by Medicare, Tricare, and other Government Payors for services provided at DSCC's and USDP's offices.

8. As required by the False Claims Act, 31 U.S.C. § 3730(b)(2), Relator has provided to the Attorney General of the United States and to the United States Attorney for the Western District of Missouri a statement of all material evidence and information related to the complaint. This disclosure statement is supported by material evidence known to Relator at the time of filing, establishing the existence of AP's, CP's, DSCC's, USDP's, *et al.*'s false claims.

9. Because the statement includes attorney-client communications and work product of Relator's attorneys, and is submitted to the Attorney General and the United States Attorney in their capacity as potential co-counsel in the litigation, Relator understands this disclosure to be confidential.

10. Relator is a citizen of the United States and resident of the State of Kansas.

11.     Relator brings this action based on her direct, independent, and personal knowledge and also, on information and belief.

12.     Relator is an original source of this information to the United States.  She has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the government included in this action under the False Claims Act, which is based on this information.

13.     Relator is a dermatologist with over twenty years of experience who owns her own private dermatology practice near the Kansas City, MO area.  Relator received training in Mohs surgery during her dermatology residency training.

14.     In this position, Relator has become an expert in diagnosing various skin cancers and methods of treatment.  Relator and Defendants have mutual patients and exchange patient information.  Through these interactions, Relator observed abnormalities in patients' medical records showing fraudulent Medicare and Tricare billing by Defendants.

15.     U.S. Dermatology Partners ("USDP") provides a variety of dermatological services, including Mohs surgery.  USDP is incorporated in the States of Delaware and Colorado.  USDP has more than fifty offices nationwide, and is a partner of DSCC in Missouri and Kansas.  USDP/DSCC have offices at 3265 NE Ralph Powell Rd, Lee's Summit MO 64064 and 11550 Granada St., Leawood KS, 66211.

16.     OSDM is a Management Services Organization owned by USDP and bills for payment on behalf of USDP using the employer identification number 461330993.  OSDM is incorporated in the state of Delaware and maintains an office at USDP Lee's Summit.

17.     Abry Partners is a private equity firm that owns USDP and OSDM.  Abry Partners, LLC is incorporated in the State of Delaware with its principal place of business at 888 Boylston St. Ste. 1600, Boston MA, 02199-8193.

18.     Dr. Glenn Goldstein, MD is a Board-Certified Dermatologist who performs Mohs surgery at USDP Leawood.  He is also the regional medical director of OSDM and a shareholder in USDP.  He sold his practice in 2014 to CP, which AP then purchased from CP in 2016.

19.     Candescent Partners LLC is located at 2 Oliver St. Ste. 10B, Boston MA, 02109. Another office is located at 800 Boylston St. Ste. 810, Boston MA, 02199.

20.     Dr. Mark Fleischman, MD, FAAD is a Board-Certified Dermatologist who performs Mohs surgery at USDP Leawood in Kansas and USDP Lee's Summit in Missouri.

21.     Dr. Shawn Sabin, MD, FAAD is a Board-Certified Dermatologist who performs Mohs surgery at USDP Lee's Summit and USDP Leawood.

22.     Dr. Karen Neubauer, DO, FAAD is a Board-Certified Dermatologist who performs Mohs surgery at USDP Leawood.

23.     Dr. Julie S. Green, MD, PhD, FAAD is Board-Certified Dermatologist who provides dermatologic services at USDP Lee's Summit.

24.     Dr. Elizabeth Spenceri, MD, FAAD is a Board-Certified Dermatologist who performs Mohs surgery at USDP Leawood.

## JURISDICTION AND VENUE

25.     This action arises under the False Claims Act, 31 U.S.C. § 3729. This Court has subject matter jurisdiction over this case pursuant to 31 U.S.C. §§ 3732(a) and 3730(b). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1331.

5

26.    This court has personal jurisdiction over AP, CP, OSDM, USDP, and DSCC because they transact business in this district.  Furthermore, USDP, DSCC, and OSDM maintain offices in this district.

27.    This court has personal jurisdiction over Dr. Fleischman, Dr. Goldstein, Dr. Sabin, Dr. Neubauer, Dr. Green, and Dr. Spenceri, because they transact business in the Western District of Missouri and because the acts proscribed by 31 U.S.C. § 3729 *et seq*. and complained of herein resulted from Defendants' contacts with the Western District of Missouri.

28.    Venue is proper in this District pursuant to 31 U.S.C. § 3732(a), because the acts proscribed by 31 U.S.C. § 3729 *et seq*. and complained of herein took place in this District, and is also proper pursuant to 28 U.S.C. § 1391(b) and (c), because at all times material and relevant, Defendants transact and transacted business in this District.

## THE FALSE CLAIMS ACT

29.    The False Claims Act ("FCA") provides, in pertinent part:

(a) Any person who (A) knowingly presents, or causes to be presented, a false claim for payment or approval; (B) knowingly makes, uses, or causes to made or used, a false record or statement material to a false or fraudulent claim, is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person.

(b) For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in

6

reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

30.    For the purposes of the FCA, "person," includes corporations. *Cook County, Ill. v. United States ex rel. Chandler*, 538 U.S. 119, 125 (2003).

31.    There are four elements that must be met to succeed in a qui tam action under § 3729(a)(1)(A): (1) a false statement or fraudulent course of conduct; (2) that was made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money.  *U.S. ex rel. Johnson v. Kaner Medical Group, P.A.*, 641 Fed. Appx. 391, 394 (5th Cir. 2016).

32.    "Material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

33.    Factual falsity is established when the claim involves an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided. *U.S. v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1266 (D.C. Cir. 2010).

34.    A claim may be false if it falsely certifies compliance with an applicable statute, regulation or contract, and false certifications can be either express or implied.  *U.S. v. Dynamic Visions, Inc.*, 216 F. Supp.3d 1, 14 (D.D.C. 2016).

35.    A claim is false or fraudulent on the basis of implied certification when noncompliance with regulations is material to the Government's decision to reimburse the claims.  See *Universal Health Servs., Inc., v. U.S.*, 136 S. Ct. 1989, 1996 (2016).

## FACTS COMMON TO ALL COUNTS

### A.    Medicare

36.     The Medicare program was created in 1965 as part of the Social Security Act, 42 U.S.C. § 1395 *et seq*.  Medicare is a federal health insurance program for the aged and disabled.

37.     During the relevant time period, the United States administered and funded Medicare, pursuant to the Social Security Act, 42 U.S.C. § 1395 *et seq.* By becoming a participating provider in Medicare, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicare.  In order to receive Medicare funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

38.     The Centers for Medicare and Medicaid Services ("CMS") is an agency of the United States Department of Health and Human Services ("HHS") and is responsible for the administration of the Medicare Program.

39.     Medicare consists of two basic parts: Part A (42 U.S.C. §§ 1395c-13951-5) and Part B (42 U.S.C. §§ 1395J-1395w-4).  Medicare Part A covers a variety of inpatient services.  Medicare Part B covers medically necessary outpatient services for diagnosis and treatment.

40.     Medicare Administrative Contractors ("MACs") are private healthcare insurers that have been awarded a contract by CMS to process Medicare Part A and Part B (A/B) medical claims in a specified geographic jurisdiction.

41.     Medicare Advantage Plans ("MAPs") are offered by private companies that contract with CMS.  These plans cover all Part A and Part B benefits.  MAPs include: Health Maintenance Organizations ("HMOs"), Preferred Provider Organizations ("PPOs"), and Private Fee-for-Service Plans.

42.   Reimbursement by Medicare varies based on "locality."  DSCC Lee's Summit is in Missouri Locality 0530202.  DSCC Leawood is in Kansas locality 0520200.  The Medicare Part B Physicians Fee Schedule establishes the reimbursement rate for services performed by medical professionals.

43.   Providers seeking reimbursement for services rendered to Medicare patients must submit a CMS-1500 form to the MAC.  The CMS-1500 form lists CPT codes for the services rendered and identifies who provided them.

44.   The CMS-1500 form requires the entity to certify that the services on the form were medically necessary.  The provider who orders the service must maintain documentation of medical necessity in the beneficiary's medical record.  42 C.F.R. § 410.32(d)(2)(i).

45.   In order for providers to be reimbursed by Medicare for Part B services, they must submit a CMS-1500 form with correct CPT codes.

46.   CMS CPT codes have three components: work Relative Value Unit ("RVU"), practice expense RVU and malpractice expense RVU.  A surgery performed in a facility, such as an ambulatory surgical center, has a lower practice expense RVU since no expenses are allocated to overhead, staff, equipment and supplies used to perform a service. A non-facility rate is for services performed in an office and is higher because of overhead.

**B.   Meaningful Use, Medicare Access and CHIP Reauthorization ACT of 2015 (MACRA) and Merit-Based Incentive Payment System (MIPS)**

47.   Meaningful Use was a CMS incentive program to improve use of Electronic Health Records technology and exchange.

48.   Meaningful Use had 15 core objectives, including providing patients with an electronic copy of their health information upon request and protecting electronic health information. CMS, An Introduction to the Medicare EHR Incentive Program for Eligible

9

Professionals, https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/EHR_Medicare_Stg1_BegGuide.pdf.

49.     Protecting electronic health information involved conducting or reviewing a security risk analysis in accordance with the requirements under 45 C.F.R. § 164.308(a)(1). Providers were also required to implement security updates and correct identified security deficiencies as part of its risk management process.

50.     Providing patients with an electronic copy of their health information upon request required providers to give more than 50% of all patients who requested an electronic copy of their health information a copy within 4 business days.  CMS, An Intro. to the Medicare EHR Incentive Program for Eligible Professionals, https://www.cms.gov/Regulations-and-Guidance/Legislation/EHRIncentivePrograms/Downloads/EHR_Medicare_Stg1_BegGuide.pdf.

51.     Eligible professionals who did not meet *all* of the requirements for meaningful use by 2015 were subject to payment penalties of 1% to 5%.  *Id.*

52.     To show compliance with Meaningful Use, providers were required to report data to CMS showing they successfully met each of the 15 requirements for an entire calendar year. Reporting was done using the CMS Attestation Worksheet.  During attestation, physicians were required to enter data and answer questions about the 15 core requirements.  *Id.*

53.     Payment adjustments under Meaningful Use were replaced in 2018 with MIPS pursuant to the Medicare Access and CHIP Reauthorization Act of 2015 ("MACRA").  MACRA requires CMS to implement an incentive program, the Quality Payment Program ("QPP"). MIPS is one QPP.

54.    MIPS lists four categories of performance for physician eligibility: Quality, Resource Use, Clinical Practice Improvement Activities, and Advancing Care Information/Promoting Interoperability ("PI").

55.    CMS renamed "Advancing Care Information" to "Promoting Interoperability" to focus on electronic exchange of health information using certified electronic health record technology.  This category also replaced Meaningful Use.

56.    Providers must meet five required measures for a minimum of 90 days in the PI category to receive credit towards their MIPS score.  Providers must meet nine more requirements for a minimum of 90 days to receive additional credit towards their MIPS score.  PI counts for 25% of the overall MIPS score.  Physicians Advocacy Institute, 2019 Merit-Based Incentive Payment System (MIPS) Scoring Overview, www.physiciansadvocacyinstitute.org.

57.    The PI Category has 6 required reporting measures. One of the required measures is the ability to provide patients electronic access to their healthcare information.  The maximum points allotted for this requirement is 40 points.  The Health Information Exchange subcategory requires supporting electronic referral loops by sending health information.  The maximum points allotted for this requirement is 20 points.  *Id*.

58.    Importantly, reporting a "no" response to a "yes or no" required reporting measure results in a PI score of 0.   American Optometric Association, "2019 MIPS Guidebook," (January 2019), https://www.aoa.org/Documents/MORE/2019%20MIPS%20Guidebook_ Road%20Map %20for% 20Doctors.pdf.

59.    MIPS requires the Secretary of HHS to develop and provide clinicians with a Composite Performance Score that is based off of performance in each of the four categories. Based on the score, physicians may receive payment adjustments.  Scores range from 0-100.  42

11

C.F.R. § 414.1305. Physicians with high scores are eligible to receive higher Medicare reimbursement. The maximum adjustment for 2019 is 4% and in 2020 5%. Brett Paepke, "MIPS: The Final Rule and You," Nov. 15 2016, https://insight.revolutionehr.com/wp-content/uploads/MIPS-The-Final-Rule-and-You-slides.pdf.

60.    MIPS adjustments began in 2019 based on 2017 performance. For this period, these categories were assessed: (1) Advancing Care Information (Now PI), (2) Quality, and (3) Improvement Activities.

61.    Within each category, CMS uses the following formula to determine the categorical score: (Points earned/Total Possible Points in Category)(Performance Category Weight) = Earned Points.

62.    For 2017, the calculation for MIPS scores was (Quality Score x 60%)(100) + (Improvement Activities Score x 15%)(100) + (PI Score x 25%)(100). Providers needed to earn at least 3 points to avoid a negative payment adjustment and above 70 points to receive an additional positive adjustment. Physicians Advocacy Institute, 2019 Merit-Based Incentive Payment System (MIPS) Scoring Overview, www.physiciansadvocacyinstitute.org

63.    For 2018, the calculation for MIPS scores was (Quality Score x 50%)(100) + (Improvement Activities Score x 15%)(100) + (PI Score x 25%)(100) + (Cost Score x 10%)(100). *Id*. Providers were required to score above 15 points to avoid a negative cost adjustment and 70 points or above to receive an additional positive adjustment. *Id*.

64.    For 2019, the calculation for MIPS scores is (Quality Score x 45%)(100) + (Improvement Activities Score x 15%)(100) + (PI Score x 25%)(100) + (Cost Score x 15%)(100). Providers must score above 30 to avoid a negative cost adjustment and above 75 to

12

receive an additional positive adjustment. Physicians Advocacy Institute, 2019 Merit-Based Incentive Payment System (MIPS) Scoring Overview, www.physiciansadvocacyinstitute.org.

65.     Federal law requires that MIPS eligible physicians that submit data and information to CMS for purposes of MIPS retain data and information for 6 years from the end of the MIPS performance period. 42 C.F.R. § 414.1390(d).

66.     A database of publicly available MIPS scores has been compiled by the Health IT consulting firm called Chirpy Bird Health IT Consulting. Chirpy Bird provides its clients with services to optimize compliance with MIPS.

67.     Physician participation in MIPS can be verified at the Quality Payment Program website hosted by CMS, https://qpp.cms.gov/participation-lookup.

### C.     Tricare

68.     During the relevant time period, the United States administered and funded the Civilian Health and Medical Program of the Uniformed Services (formerly known as CHAMPUS and now called the Tricare program). Tricare provides medical and dental care to members and certain former members of the uniformed services and their dependents. 10 U.S.C. § 1071 *et seq*. By becoming a participating provider in Tricare, enrolled providers agree to abide by the rules, regulations, policies, and procedures governing claims for payment, and to keep and allow access to records and information as required by Tricare. In order to receive Tricare funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all Tricare regulations, and all applicable policies and procedures issued by the State.

69.     Tricare is managed by the Defense Health Agency ("DHA"), which assumed this responsibility on October 1, 2013. The DHA contracts with private insurers to process Tricare claims for a specified geographic area.

13

70.    Tricare was divided into three regions in 2004. Tricare North included the area covering St. Louis, Missouri. Tricare West covered the rest of the Missouri area.

71.    Before January 1, 2018, Health Net Federal Services, LLC ("HNFS") was responsible for administration of Tricare services in the North region covering St. Louis. Before January 1, 2018, United Health Group ("UHG") was responsible for administration of Tricare services in the West region covering the rest of Missouri.

72.    On January 1, 2018, Tricare was reconfigured into two regions, Tricare East and Tricare West. Humana Military Healthcare Services, Inc. ("HMH") is responsible for administration of Tricare services in the East region covering the St. Louis area. HNFS administers Tricare services in the West region covering the rest of Missouri and Kansas.

**D.    Ambulatory Surgery Centers**

73.    An Ambulatory surgical center or ASC means any distinct entity that operates exclusively for the purpose of providing surgical services to patients not requiring hospitalization and in which the expected duration of services would not exceed 24 hours following an admission.  42 C.F.R. § 416.2.  CMS interpretive guidelines of this regulation state that a "common space may not be used during concurrent or overlapping hours of operation of the ASC and the physician office." State Operations Manual, "Appendix L – Guidance for Surveyors: Ambulatory Surgical Centers," last visited April 22 2020, https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/downloads/ som107ap _l_ambulatory.pdf.  This rule is also stated on the CMS website that "An ASC and another entity, such as an adjacent physician's office, may not mix functions and operations in a common space during concurrent or overlapping hours of operations."  CMS, "Ambulatory Surgery

14

Centers," last visited April 22 2020, https://www.cms.gov/Medicare/Provider-Enrollment-and-Certification/CertificationandComplianc/ASCs.

74.    An ASC must maintain complete, comprehensive, and accurate medical records to ensure adequate patient care. 42 C.F.R. § 416.47.

75.    ASCs must have a separate recovery room and waiting area. 42 C.F.R. § 416.44(a)(2).

76.    Covered procedures performed in an ASC are those surgical and other medical procedures that are specifically enumerated by CMS and that do not meet certain exclusions.  42 C.F.R. § 416.166.  Non-medically necessary procedures are excluded from coverage. *Id*. § (c)(8).

77.    ASCs are routinely inspected by CMS.  In 2015, DSCC Lee's Summit was inspected by the state of Missouri and was found to be in violation of CMS regulations regarding mixed functions and operations between an ASC and office space.  Defendants DSCC, USDP, and OSDM did nothing to correct the issues noted during the inspection and instead changed their billing practices.  Specifically, DSCC, USDP, and OSDM began billing as if all Mohs skin cancer surgery procedures done at the Lee's Summit office were done in an ASC, even though the rooms were not retrofitted to meet CMS specifications for ASCs.  DSCC Leawood still uses an irregular protocol of transferring patients from an exam room to improper ASCs, in violation of CMS regulations, to receive higher reimbursement from Medicare.

78.    Facility fees are charges that are paid when patients visit clinics that are not owned by that doctor in addition to the charge of the procedure performed.  Medicare reimburses ASCs for facility fees in addition to procedures performed in ASCs.

   **E.    Mohs Surgery**

79.    Mohs surgery is a commonly used method to treat skin cancer and is typically done in an outpatient office equipped with a cryo-histology lab.

80.    Tissue is removed from around the margins of the cancerous lesion and this removed tissue is marked based on the location of the tumor and then frozen and stained on a microscope slide.  The slide is read and interpreted by the surgeon.  If the slide shows no cancerous cells, the patient's wounds are repaired.  If the surgeon observes cancerous cells on the slide, the surgeon removes the corresponding cancerous tissue from the patient.  The procedure is repeated until cancerous cells are not found on the slides.  Once the cancerous cells are gone, the patient's wounds are repaired.

81.    Usually, the entire procedure is performed in the same office, including the repair of the wound that results from Mohs surgery.

82.    However, Defendants performed Mohs procedures in an outpatient exam room located in the ASC and then transferred patients to a room labeled as an ASC solely to receive higher reimbursement from Government health insurers.  This protocol earned higher reimbursement than either performing Mohs excision and repair in an exam room or performing both Mohs excision and repair in an ASC room.  By doing this, Defendants made more money while inflating costs.

83.    Furthermore, transfer to an ASC is not medically necessary as Mohs surgery and the repair can be safely performed, and is most commonly performed, in outpatient exam rooms. Defendants therefore violated 42 C.F.R. § 410.32(d)(2)(i) requirements regarding medical necessity of services.

84.    Mohs Surgery Stage 1 is coded as 17311 and is currently reimbursed by CMS at a non-facility price of $633.11 and a facility price of $365.20 in MAC Locality 0520200 for

16

Kansas. When Mohs is done in an ASC, it is reimbursed at the facility price. A facility fee is also charged when an ASC is used, which for USDP is $242.06.

85.    Additionally, patients must meet CMS LCD criteria in order for Mohs Surgery to be an appropriate indication for treatment.

**F.    <u>Wound Repair</u>**

86.    Repairs of wound closures are billed in three categories: (1) Simple, (2) Intermediate, (3) Complex. Complex repairs are the most expensive repair.

87.    Simple repair codes 12001-12018 are used for wounds of various sizes that involve the outer layers of the skin. In the case of an excision and simple repair, only the excision is billed and reimbursed.

88.    For example, CPT code 12001 is for repairs that are 2.5 cm or less and CMS currently reimburses this procedure at a non-facility price of $84.58 and a facility price of $43.22 in the Kansas locality 0520200. CMS currently reimburses this procedure at a non-facility price of $89.36 and a facility price of $45.63 in the Missouri MAC locality 0530202.

89.    Intermediate repair codes 12031-12057 are used for wounds that involve a layered closure of deeper layers of skin compared to a simple repair.

90.    For example, CPT code 12031 is for intermediate repairs of wounds of the scalp, axillae, trunk and/or extremities that are 2.5 cm or less. CMS currently reimburses this procedure at a non-facility price of $232.27 and a facility price of $147.57 in the Kansas locality 0520200. The non-facility reimbursement is $246.14 and the facility reimbursement is $156.60 in the Missouri locality 0530202.

91.    Complex repairs are the most involved procedure and involve scar revisions, debridements, undermining, or stents or retention sutures in addition to preparation. HCPRO,

17

Know guidelines and subtle differences in code descriptions for laceration repairs, Sep. 8 2009, https://www.hcpro.com/HIM-238554-8160/Know-guidelines-and-subtle-differences-in-code-descriptions-for-laceration-repairs.html

92.     CPT code 13132 is for complex repairs of the forehead, cheeks, chin, mouth, neck, axillae, genitalia, hands and/or feet and is currently reimbursed for a non-facility at $483.27 and at $322.58 for a facility in Missouri locality 0530202.  In Kansas locality 0520200, CMS currently reimburses a non-facility for $456.24 and $304.23 for a facility.

93.     Mohs surgery leaves a circular wound in patients that is difficult to close with sutures.  In order to close the wound, physicians often use a technique that turns the circular wound into an ellipse in order for closure to be performed.  The specific technique involves what are known as "Burow's Triangles" and use of this method does not justify billing for complex repairs according to Relator.

### G.     Billing

94.     Generally, Mohs surgery is all done in the same office and room on an outpatient basis.  Outpatient procedures are billed at the non-facility rate to cover overhead expenses.

95.     Under the Multiple Procedure Reduction Rule ("MPRR"), when providers report more than one procedure during a single patient encounter, CMS will reimburse only the highest-cost procedure at the full fee schedule value.  See John Verhovshek, Just the Facts: Multiple Procedure Payment Reductions (MPPR), Apr. 5 2018, https://www.aapc.com/blog/41773-mppr-facts/.  Less expensive procedures performed during the same encounter are reimbursed at 50% the fee schedule value.  Id.

96.     Mohs procedure and the repair are considered separate procedures, with Mohs being the more expensive procedure.  Therefore, the repair is not reimbursed at the full fee

18

schedule value and is subject to a 50% reduction when standard Mohs procedure protocols are followed. When Mohs is done in an outpatient exam room, it is reimbursed at $633.11 as discussed above. A complex repair coded as 13132 is reimbursed at $456.24 multiplied by 0.5 for a total of $228.12. The total bill for this protocol is $861.23.

97. When Mohs is done in an ASC, it is reimbursed at $365.20. The facility fee of $242.06 is also charged. A complex repair performed in the ASC coded as 13132 is reimbursed at $304.23 multiplied by 0.5 for a total of $152.12. The facility fee is also charged and is subject to the 50% reduction for a total of $121.03. This amounts to a total of $880.41.

98. A Mohs surgery done in an exam room with a repair done in an ASC yields the highest reimbursement. Mohs would be billed using 17311 for a total of $633.11. The repair is then billed using 13132 and reimbursed at $152.12. The facility fee for the ASC is charged at $242.06. This totals $1,027.29.

99. Billing Mohs in an exam room and the repair in an ASC results in more being billed than would be allowed if billed properly.

100. Defendants bill Government payors for use of an ASC for the repair to increase reimbursement. There is no medical necessity in transferring Mohs patients from an exam room to an ASC.

## COUNT I

### Violation of False Claims Act § 3729 *et seq*.

### Billing for Medically Unnecessary Use of Ambulatory Surgery Center

101. Relator re-alleges and incorporates every other paragraph of this Complaint as though fully set forth herein.

19

102. Defendants used a medically unnecessary transfer protocol for Mohs surgery and repair in order to increase reimbursement from insurance providers, including Government payors. Use of this protocol for patients not covered by a Government healthcare program provides evidence of a widespread pattern of billing in a manner that drove up the costs of care. The following examples demonstrate this pattern:

a. Patient A presented to DSCC Lee's Summit on October 15, 2015 for Mohs surgery and repair. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 1.

b. Patient B presented to DSCC Leawood on February 18, 2016 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 2, Ex. 35.

c. Patient C presented to DSCC Leawood on March 24, 2016 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 3.

d. Patient D presented to DSCC Leawood on July 20, 2016 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 4.

e. Patient E presented to DSCC Leawood on October 12, 2016 for Mohs surgery and repair performed by Dr. Spenceri. After the Mohs surgery, the patient was

20

transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 5.

f.  Patient F presented to DSCC Leawood on January 5, 2017 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 6.

g.  Patient G presented to DSCC Leawood on February 3, 2017 for Mohs surgery and repair performed by Dr. Spenceri. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 7.

h.  Patient H presented to DSCC Leawood on March 10, 2017 for Mohs surgery and repair performed by Dr. Spenceri. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 8.

i.  Patient I presented to DSCC Leawood on June 14, 2017 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 9.

j.  Patient J presented to DSCC Leawood on July 19, 2017 for Mohs surgery and repair performed by Dr. Spenceri. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 10.

21

k. Patient K presented to DSCC Leawood on February 26, 2018 for Mohs surgery and repair performed by Dr. Neubauer. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 11.

l. Patient L presented to DSCC Leawood on September 16, 2019 for Mohs surgery with Dr. Neubauer. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 12.

m. Patient BB presented to DSCC Leawood on August 13, 2015 for Mohs surgery and repair performed by Dr. Fleischman. After the Mohs surgery, the patient was transferred to an ASC for the repair solely so Defendants could bill for higher reimbursement. Ex. 22.

103. On March 10, 2016, Patient M presented to DSCC Leawood for Mohs surgery performed in a non-facility room with Dr. Fleischman. After the two stage Mohs procedure, the patient was transferred to a room designated as an ASC solely for the purposes of billing for higher reimbursement. A complex repair was performed in the room designated as an ASC.

104. Dr. Fleischman failed to document any rationale for the medical necessity for the transfer to the "ASC" for a repair only in Patient M's medical record, in violation of 42 C.F.R. § 410.32(d)(2)(i). The medical record merely states "After obtaining clear surgical margins the patient was sent to an ASC for surgical repair." See Ex. 13. The room designated as an ASC did not meet CMS criteria for certification as an ASC due to mixed use. See 42 C.F.R. § 416.2.

105. Defendants DSCC, USDP and Dr. Fleischman then filled out a CMS-1500 form with the codes 17311 and 17312. Despite the absence of medical necessity for transfer to an

22

ASC for the surgical repair and the fact that the ASC did not meet CMS criteria for certification as an ASC, Defendants filled out the CMS-1500 form with the code 13132 and the facility fee.

106. Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM. Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Kansas. The MAC then presented these claims to Medicare.

107. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that transfer to an ASC was medically necessary because they knew billing this way would increase their reimbursement. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with CMS regulations regarding mixed use because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" facility had mixed use and was therefore noncompliant with CMS requirements for certification as an ASC. Furthermore, the transfer for the repair was medically unnecessary and done solely for the purpose of increasing reimbursement. Defendants knew this was medically unnecessary because Lee's Summit was no longer able to use this same protocol after the inspection in 2015. If in fact the protocol Lee's Summit was using was medically necessary, CMS would have allowed them to transfer patients from the second floor Mohs non-facility room to the ASC on the first floor. Therefore, Defendants at Leawood knew the transfer was not medically necessary.

108. Medicare, unaware of the truth or falsity of the claims and that Defendants were in violation of ASC regulations, then paid for the claims. The reimbursement amounted to

23

additional amounts if billed properly.   Defendants received an additional  payment for the protocol involving the unnecessary transfer to the ASC for surgical repair.

109.  Defendants' false certifications were material to CMS's decision to reimburse the claims because Medicare has limited funds and therefore the Government seeks to avoid wasting these funds on medically unnecessary procedures and charges.

110.  Prior to sometime in 2015, DSCC Lee's Summit used the same protocol of transferring patients from a normal exam room after Mohs surgery to a room designated as an ASC solely for the purposes of billing higher reimbursement.  However, in 2015, CMS conducted an inspection and found DSCC Lee's Summit to be in violation of mixed use regulations.  Instead of correcting the billing problems, DSCC Lee's Summit designated the rooms previously as Mohs rooms  as ASC rooms.  The ASC facilities remain improper because the previous Mohs exam rooms were not retrofitted to meet CMS criteria for designation as an ASC.

111.  On April 6, 2016, Patient N presented to DSCC Lee's Summit for Mohs surgery. The two stage procedure and complex repair were performed in improper ASCs.  On July 14, 2016, Patient N presented to DSCC Lee's Summit for Mohs surgery.  The one-stage procedure was done in one stage and a complex repair were performed in an improper ASC.  On August 24, 2016, Patient N presented to DSCC for Mohs surgery.  The two stage procedure and a complex repair were performed in an improper ASC.  On October 4, 2016, Patient N presented to DSCC Lee's Summit for Mohs surgery.  The two stage procedure and complex repair were performed in an improper ASC.  See Exhibits 14, 15, 16, 17.

112.  Defendants could not bill with the exam to ASC transfer method because of the audit in 2015 where Defendants were found to be in violation of CMS regulations regarding

24

mixed use of other entities with an ASC. Therefore, Defendants billed as if all procedures took place in an ASC, even though some of the rooms used were no different than normal exam rooms and were noncompliant with CMS regulations for certification as an ASC. Despite the fact that these ASCs were noncompliant with CMS regulations for certification of an ASC, Defendants filled out the CMS-1500 form with the codes 17311, 17312 and 13132 with the facility fees for each procedure.

113. Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM. Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Missouri. The MAC then presented these claims to Medicare.

114. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with CMS regulations because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" rooms were no different from normal exam rooms, making their claims for use of an ASC factually false.

115. Medicare, unaware of the truth or falsity of the claims, paid for the two stage Mohs and repair claims. The reimbursement amounted to $384.99 plus $204.68, with the $242.06 facility fee charged twice for both stages, plus $159.80 for the repair after the 50% reduction, with the $121.03 50% reduced facility fee for a total of $1,354.62.

116. Medicare, unaware of the truth or falsity of the claims, paid for the one stage Mohs and repair claims. The reimbursement amounted to $384.99 plus the facility fee of $242.06 and $159.80 for the repair after the 50% reduction, with the facility fee after 50% reduction for $121.03. This amounted to a total of $907.88.

117.  Had CMS known that Defendants were improperly documenting and billing for a transfer to an ASC, it would have denied the claims.  Defendants' false certifications were material to CMS's decision to reimburse the claims because Medicare has limited funds and therefore the Government seeks to avoid wasting these funds on medically unnecessary procedures.

118.  On November 22, 2016, Patient O presented to DSCC Leawood for Mohs surgery performed in a non-facility room by Dr. Spenceri.  After the one stage procedure, the patient was then transferred to a room designated as an ASC solely for the purposes of billing for higher reimbursement.  A complex repair was performed in the ASC room.

119.  Dr. Spenceri failed to document any rationale for the medical necessity for the transfer to the ASC for a repair only in Patient O's medical record, in violation of 42 C.F.R. § 410.32(d)(2)(i).  The medical record merely states "Referred to ASC for closure."  See Ex. 18.  The room designated as an ASC did not meet CMS criteria for certification as an ASC due to mixed use. See 42 C.F.R. § 416.2.

120.  Despite the absence of medical necessity for transfer to an ASC for the surgical repair and the fact that the ASC did not meet CMS criteria for certification as an ASC, Defendants filled out CMS-1500 forms with CPT code 17311 and 13132 with the facility fee for the repair.

121.  Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM.  Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Kansas.  The MAC then presented these claims to Medicare.

122.  Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that  transfer to an ASC was medically

necessary because they knew billing this way would increase their reimbursement. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with CMS regulations regarding mixed use because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" facility had mixed use and therefore was noncompliant with CMS requirements for certification as an ASC. Furthermore, the transfer for the repair was medically unnecessary and done solely for the purpose of increasing reimbursement. Defendants knew this was medically unnecessary because Lee's Summit was no longer able to use this same protocol after the inspection in 2015. If in fact the protocol Lee's Summit was using was medically necessary, CMS would have allowed them to transfer patients from the second floor Mohs non-facility room to the ASC on the first floor. Therefore, Defendants at Leawood knew the transfer was not medically necessary.

123. Medicare, unaware of the truth or falsity of the claims, then paid for the claims, which were ultimately received by Defendants. The reimbursement Defendants received is higher than if billed properly. Defendants received an additional payment for the protocol involving the unnecessary transfer to the ASC for surgical repair.

124. Had CMS known that Defendants were transferring patients for repairs in the ASC solely for the purpose of increasing reimbursement, it would have denied the claims . Defendants' false certifications were material to CMS's decision to reimburse the claims because Medicare has limited funds and therefore the Government seeks to avoid wasting these funds on medically unnecessary procedures and charges.

125. On March 2, 2017, Patient N presented to DSCC for Mohs surgery. The procedure was done in one stage and a complex repair was performed. On July 28, 2017, Patient N presented to DSCC Lee's Summit for Mohs surgery. The two stage procedure and complex repair were performed in an improper ASC. On September 28, 2017 Patient N presented to DSCC Lee's Summit for Mohs surgery. The two stage procedure a complex repair were performed in an improper ASC. On October 11, 2017, Patient N presented to DSCC Lee's Summit for Mohs surgery. The two stage procedure and a complex repair were performed in an improper ASC. See Exhibit 19, 20.

126. Defendants could not bill with the exam to ASC transfer method because of the 2015 audit. Therefore, Defendants billed as if all procedures took place in an ASC, even though the Mohs rooms used were no different than normal exam rooms. Despite the fact that these ASCs were noncompliant with CMS regulations for certification of an ASC, Defendants filled out CMS-1500 forms with the codes 17311, 17312, and 13132 with the facility fees for each procedure.

127. Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM. Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Missouri. The MAC then presented these claims to Medicare.

128. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with CMS regulations regarding mixed use because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" Mohs

28

rooms were no different from the normal exam rooms, making their claims for use of an ASC factually false.

129.   Medicare, unaware of the truth or falsity of the claims, then paid for the two-stage Mohs and repair claims.  The reimbursement amounted to $388.51 plus $206.71, with the facility fee for both procedures of $242.06, and $161.37 for the repair after the 50% reduction, with the facility fee, subject to the 50% reduction for a price of $121.03, for a total of $1,361.74.  .

130.   Medicare, unaware of the truth or falsity of the claims, paid for the one-stage Mohs and repair claims.  The reimbursement amounted to $388.51 and the facility fee of $242.06 plus $151.98 after the 50% reduction with the facility fee of $121.03.  This amounted to a total bill of $903.58.

131.   On January 3, 2018, Patient N presented to DSCC Lee's Summit for Mohs surgery performed by Dr. Sabin.  The procedure and complex repair were performed in an ASC. See Exhibit 21.

132.   Despite the fact that these ASCs were noncompliant with CMS regulations for certification as an ASC, Defendants then filled out CMS-1500 forms with the codes 17311 and 13132 with the facility fees.

133.   Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM.  Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Missouri.  The MAC then presented these claims to Medicare.

134.   Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with CMS regulations regarding mixed use because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office.  Defendants acted knowingly, or in deliberate

ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" rooms in which the repair took place were no different from the normal exam rooms, making their claims for use of an ASC factually false.

135. Medicare, unaware of the truth or falsity of the claims, then paid for the claims. The reimbursement amounted to $389.43, with the facility fee of $242.06, $152.77 with the facility fee of $121.03, after the 50% reduction. This amounted to a total of $905.29.

136. Had CMS known that Defendants were improperly documenting and billing for services performed in a non-CMS certified ASC, it would have denied the claims. Defendants' false certifications were material to CMS's decision to reimburse the claims because Medicare has limited funds and therefore the Government seeks to avoid wasting these funds on medically unnecessary procedures. It is a violation of applicable regulations if an ASC is not certified.

137. On July 31, 2014, Patient BB presented to DSCC Leawood for Mohs surgery performed in a non-facility room by Dr. Fleischman. The Mohs procedure was done in one stage. The patient was transferred to a room designated as an ASC solely for the purposes of billing higher reimbursement. A complex repair was performed in the ASC room.

138. There is no documentation of medical necessity for the transfer to the ASC for a repair only Patient BB's medical record, in violation of 42 C.F.R. § 410.32(d)(2)(i). See Exhibit 22. The room designated as an ASC did not meet CMS criteria for certification as an ASC due to mixed use. 42 C.F.R. § 416.2

139. Despite the absence of medical necessity for transfer to an ASC for the surgical repair and the fact that the ASC did not meet CMS criteria for certification as an ASC, Defendants filled out CMS-1500 forms with the code 17313 and 13121 with the facility fee for the repair.

140. Defendants then presented, or caused to be presented, these false CMS-1500 forms to OSDM. Defendant OSDM then presented, or caused to be presented, these false CMS-1500 forms to the MAC for Missouri. The MAC then presented these claims to Medicare.

141. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that transfer to an ASC was medically necessary because they knew billing this way would increase their reimbursement. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims by falsely certifying that the ASC was in compliance with Tricare regulations regarding mixed use because they had been placed on notice of this requirement after the 2015 audit of the Lee's Summit office. Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" facility had mixed use and therefore was noncompliant with Tricare requirements for certification as an ASC. Furthermore, the transfer for the repair was medically unnecessary and done solely for the purpose of increasing reimbursement. Defendants knew this was medically unnecessary because Lee's Summit was no longer able to use this same protocol after the inspection in 2015. If in fact the protocol Lee's Summit was using was medically necessary, Tricare would have allowed them to transfer patients from the second floor Mohs non-facility room to the ASC on the first floor. Therefore, Defendants at Leawood knew the transfer was not medically necessary.

142. Tricare, unaware of the truth or falsity of the claims, then paid for the claims, which were ultimately received by Defendants. The reimbursement Defendants received is higher than if billed properly. Defendants received an additional payment for the protocol involving the unnecessary transfer to the ASC for surgical repair.

143. Had CMS known that Defendants were transferring the patient to an ASC room for repair solely for the purpose of increased reimbursement, it would have denied the claims. Defendants' false certifications were material to CMS's decision to reimburse the claims because Medicare has limited funds and therefore the Government seeks to avoid wasting these funds on medically unnecessary procedures.

144. As a result of billing in this manner, Defendants drove up the price of the procedures when it was not medically necessary. Therefore, Defendants submitted claims to Medicare that violated the False Claims Act.

145. Defendants acted knowingly, or in deliberate ignorance or reckless disregard of the truth or falsity of the information regarding the Mohs surgeries and repairs performed, in falsifying CMS-1500 claims forms by billing for use of the ASC and the facility fee when the procedures were those commonly done and safely performed in a normal exam room and all performed in rooms that did not meet the CMS criteria of an ASC. Furthermore, Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the claims because the "ASC" rooms did not meet criteria for ASC certification.

146. Defendants then submitted, or caused to be submitted by MAP providers and MACs, these factually false and fraudulent records to Medicare.

147. Medicare, unaware of the falsity of these claims, then reimbursed, and will continue to reimburse Defendants for a higher amount than to which they were/are entitled.

148. As a result of Defendants' actions, the U.S. was severely damaged and will continue to be severely damaged.

## COUNT II

## Violation of False Claims Act § 3729 *et seq.*

**Billing for Medically Unnecessary Mohs Surgeries**

149.  Relator re-alleges and incorporates every other paragraph of this Complaint as though fully set forth herein.

150.  Defendants often performed medically unnecessary Mohs surgeries, which resulted in higher reimbursement for Defendants.

151.  On March 10, 2016, Patient R presented to DSCC Leawood for Mohs surgery with Dr. Fleischman.  Patient R was referred to DSCC Leawood by Relator for excision of squamous cell carcinoma rather than for Mohs surgery.  See Ex. 23.

152.  Mohs surgery was inappropriate, and therefore medically unnecessary, for Patient R because the squamous cell carcinoma was not aggressive and was a small size per Relator's medical records for patient not meeting the CMS LCD criteria for Mohs.  See Ex. 23.

153.  Defendants submitted claims for this medically unnecessary Mohs surgery using form CMS-1500 to Defendant OSDM.  By billing for Mohs surgery, they falsely certified compliance with CMS standards of medical necessity, therefore, making this a false claim.

154.  Defendant OSDM then presented, or caused to be presented, these false and fraudulent forms to the MAC for Kansas, which in turn presented the claims to Medicare.

155.  Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity of the information, because they knew they would receive higher reimbursement for Mohs surgery than for the excision for which the patient was referred.

156.  Medicare, unaware of the truth or falsity of the claims paid the claims.

157.  Performance of a medically unnecessary Mohs surgery not only defrauded the U.S. Government, but also presented a greater risk of injury to the patient and potentially increased cost if the patient does not have a secondary MediGap policy.

33

158.  On July 20, 2016, Patient S presented to DSCC Leawood for Mohs surgery with Dr. Fleischman.

159.  The medical records state the indication as "aggressive pathology, immunocompromised patient, meets Mohs Appropriate Use Criteria (AUC), and tumor with difficulty estimating depth of lesion." *See* Ex. 24.

160.  However, according to Relator, Mohs surgery was inappropriate for this patient because the squamous cell carcinoma in situ and did not have an aggressive pathology as is incorrectly indicated in the DSCC visit note. See Ex. 24.  Biopsy of the tumor showed that the depth of the tumor was superficial and non-invasive, indicating that Defendants falsified the medical records to hide performance of and billing for a medically unnecessary Mohs procedure.

161.  Defendants billed Patient S's insurer for this medically unnecessary Mohs surgery.  Although Patient S was not a Medicare patient at the time of the billing, the evidence presented in Exhibit 24 is indicative of a pattern of false billing and claims.

162.  Defendants acted knowingly, or in deliberate ignorance or reckless disregard for the truth or falsity regarding medical necessity, in falsifying CMS-1500 claims forms by certifying that the Mohs surgeries reported with the requisite CPT codes on the form were medically necessary and by signing these forms.

163.  Defendants knew this certification of medical necessity was material because they were on notice of the requirement of medical necessity based on the CMS-1500 form's express statement requiring that services provided be medically necessary.

164.  Defendants then submitted, or caused to be submitted, these CMS-1500 forms with falsely certified statements of medical necessity to the KS MAC and MAPs.

165.  Medicare, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants paid and continue to pay reimbursements for services that were/are not medically necessary.

166.  As a result of Defendants' actions, the U.S. was severely damaged and will continue to be severely damaged.

## COUNT III

## Violation of False Claims Act § 3729 *et seq*.

## Upcoding Wound Closure Billing

167.  Relator re-alleges and incorporates every other paragraph of this Complaint as though fully set forth herein.

168.  In Relator's experience, the type of repair needed for a wound varies depending on patient factors, but complex repairs are not needed as frequently as Defendants were and are performing and billing.  The majority of repairs should be intermediate repairs because most surgical repairs do not meet the criteria for billing a complex repair.

169.  On March 19, 2015, Patient T came to DSCC Lee's Summit and two punch excisions of neoplasms of uncertain behavior were performed on the left inferior lateral neck and right inferior lateral neck.  See Ex. 25.

170.  Although a simple or intermediate repair was implicated, Defendants upcoded the repair to "complex" in order to obtain a higher reimbursement for the procedure.  In the alternative, Defendants performed a medically unnecessary complex repair to obtain higher reimbursement.  Although this was not a Medicare patient, such actions by Defendants are indicative of an ongoing pattern of upcoding.

171.  DSCC knew this claim was false because the same medical record contains a repair for a 0.5 cm excision of a neoplasm of the left superior anterior neck and yet this was coded as "intermediate."  This occurred on July 16, 2015.  See Ex. 25.

172.  On March 10, 2016, Patient R presented to DSCC Leawood for Mohs surgery of squamous cell carcinoma of the chest midline with Dr. Fleischman.

173.  A repair was performed on the patient.  The medical record shows that this repair only took 5 minutes.  See Ex. 23.  In Relator's experience, these repairs take more than 30 minutes on average.  Complex repairs typically require extensive undermining, difficulty controlling hemostasis (bleeding), and the use "stay" stitches.  None of these were indicated for this patient.

174.   Defendants upcoded the repair as a complex repair using CMS-1500 forms in order to obtain higher reimbursement from Medicare, in violation of the False Claims Act.  In the alternative, Defendants performed a medically unnecessary complex repair to obtain higher reimbursement.

175.  Defendants then presented, or caused to be presented these falsified claims forms to OSDM, which then presented the forms to the MAC for Kansas.  The MAC then presented the claims to Medicare, which paid for them unaware of the truth or falsity of the claims.

176.  On June 21, 2016, Patient V went to DSCC Lee's Summit for excision of Squamous Cell Carcinoma on his back after Relator referred him based on a biopsy.  Ex. 27.

177.  This type of surgical repair would be routinely billed as an intermediate repair. *See* Ex. 27.

178.  A complex repair was performed because "damaged skin around the defect made closure difficult."  See Ex. 27.  However, Relator  examined the patient at the time the biopsy

was taken.  There was no evidence at this time of any skin damage surrounding the tumor that would have required a complex repair to close the wound. Therefore, this should have been billed as an intermediate repair.

179.  DSCC upcoded the repair to "complex" using the CMS-1500 Form to obtain a higher reimbursement for the procedure from Medicare in violation of the False Claims Act.  In the alternative, Defendants performed a medically unnecessary complex repair to obtain higher reimbursement.

180.  DSCC then presented or caused to be presented the falsified CMS-1500 form to Humana, the patient's Medicare Advantage provider.  *See* Ex. 28.  Humana, unaware of the falsity of these claims presented the claim to Medicare.  Medicare, unaware of the falsity of these claims, then reimbursed the upcoded repair.

181.  Medicare and Tricare, unaware of the falsity of the claims and/or statements made or caused to be made by Defendants, reimbursed Defendants for complex repairs that were not performed and/or were medically unnecessary.

182.  As a result of Defendants' actions, the U.S. has been severely damaged and will continue to be severely damaged.

**COUNT IV**

**Violation of False Claims Act § 3729 *et seq*.**

**Falsely Attesting Meaningful Use and MIPS Compliance After Loss of EHRs**

183.  Relator re-alleges and incorporates every other paragraph of this Complaint as though fully set forth herein.

184. On February 24, 2014, Defendant USDP's and Defendant DSCC's servers crashed and there were no backup storage functions in place. This resulted in the loss of *all* electronic health records prior to October 1, 2012 for over 150,000 patients.

185. As a result of this loss of records, Defendants could not meet Meaningful Use criteria from 2014-2016 and MIPS criteria for Promoting Interoperability from 2016 to present.

186. Evidence of loss of these records is shown by several of Relator's patients:

    a. For example, Patient N's records from 2010 to 2015 have been lost as a result of the server crash. *See* Ex. 29. Relator realized the records were lost when she requested records from USDP in order to treat Patient N.

    b. Patient X's records were lost in the server crash and could not be produced upon request to the patient or to Relator, the patient's provider. *See* Ex. 30.

    c. Patient U's records were lost in the server crash and could not be produced upon request to the patient or to Relator, the patient's provider. *See* Ex. 31.

    d. Patient Y's records were lost in the server crash and could not be produced upon request to the patient or to Relator, the patient's provider. *See* Ex. 32.

    e. Patient Z's records were lost in the server crash and could not be produced upon request to the patient or to Relator, the patient's provider. *See* Ex. 33.

    f. Patient AA's records were lost in the server crash and could not be produced upon request to the patient or to Relator, the patient's provider. *See* Ex. 34.

187. Defendants were unable to meet Meaningful Use criteria for protecting patient information and providing patients with their electronic health records upon request for Patients N, X, U, Y, Z, AA, and many more. Despite this failure to qualify, Defendants did not report the loss of records to CMS or inform patients that their medical records had been lost.

188.  Defendants knowingly, or in reckless disregard for the truth or falsity of their statements, falsely claimed compliance with Meaningful Use from the date of the server crash, February 24, 2014 to January 1, 2016 by submitting false attestations regarding Meaningful Use measures on CMS attestation website.

189.  CMS, unaware that these attestations and data were false, gave Defendants higher payment adjustments during the period of February 24, 2014 to January 1, 2016.

190.  Once Meaningful Use was replaced with MIPS in 2017, Defendants still could not meet the requirements under the new payment adjustment system due to the February 24, 2014 server crash.

191.  Due to the server crash, Defendants were unable to provide patients with electronic access to their health care information, as required by the Promoting Interoperability ("PI") component of MIPS.

192.  Furthermore, Defendants could not meet the requirement of supporting electronic referral loops by sending health information, another component of scoring under PI.

193.  Despite failure to meet these requirements, Defendants made false attestations of compliance on the CMS website when they reported for the years 2017, 2018 and 2019.  These attestations resulted in PI non-zero PI scores when each Defendant should have received a score of 0 for the entire PI category due to failure to meet all of the requirements.

194.  Many Defendants made false statements to CMS such that their PI score was 25 when it should have been 0.  For example, in the year 2017, Dr. Mark Fleischman participated in MIPS under the NPI number 1215975867. See https://qpp.cms.gov/participation-lookup?py=2017&npi=1215975867.  Dr. Fleischman's PI score was reported as 25.00. See Ex. 36 from https://www.chirpybirdinc.com/mips-scores/.  However, his PI score should have been 0

because of the server crash in 2015, which resulted in the loss of all patient records from 2012 and earlier. Therefore, Dr. Fleischman could not provide patients with electronic healthcare access to the information and would have received a PI score of 0 if he had reported properly on the CMS website. His composite score for 2017 was 90.40. See Ex. 26. A score of 0 in PI, assuming all other reported measures would stay the same, would have yielded a score of 65.4. A score of 70 or above in the year 2017 resulted in additional positive payment adjustments for claims submitted to Medicare. Dr. Fleischman was not eligible for these additional positive payment adjustments and was overpaid by Medicare. Exhibit 26 shows 29 other providers from DSCC/USDP who would not be able to report compliance with PI who received high scores in PI that resulted in them receiving positive payment adjustments under MIPS.

195. Defendants acted knowingly, or in reckless disregard or deliberate ignorance of the truth or falsity of the information because the server crash was common knowledge in the Leawood and Lee's Summit offices and Defendants sent letters, such as those shown in Exhibits 29-34, to patients and providers acknowledging loss of all patient medical records.

196. CMS, unaware that Defendants' attestations and reporting were false, gave Defendants higher payment adjustments from January 1, 2018 to present.

197. As a result of Defendants' actions, the U.S. has been severely damaged and will continue to be severely damaged.

## COUNT V

## **Conspiracy to Submit False Claims**

198. Relator re-alleges and incorporates every other paragraph of this Complaint as though fully set forth herein.

40

199.  Defendants combined, conspired, and agreed together to defraud the U.S. Government by knowingly submitting false claims, for the purpose of getting the false or fraudulent claims paid or allowed, and committed other overt acts set forth above in furtherance of that conspiracy, all in violation of 31 U.S.C. § 3729(a)(1)(C).

200.  Defendants unlawfully agreed to act, or knowingly acted in concert with an implied agreement in furtherance of receiving payment on false or fraudulent claims from the U.S. Government and performed at least one act in furtherance of said agreement.

201.  As a result of Defendants' actions, the United States has been, and will continue to be severely damaged.

## PRAYER FOR RELIEF

WHEREFORE, Relator respectfully asks this Court to enter judgement against USDP, DSCC in the following:

(a) That USDP and DSCC be ordered to cease and desist from submitting and/or causing to be submitted any more false claims or otherwise violating 31 U.S.C. §§ 3729 *et seq.*;

(b) That civil penalties be imposed of not less than Five Thousand ($5,000.00) Dollars nor more than Ten Thousand ($10,000.00) Dollars for each and every false claim presented to the United States, multiplied as provided by 31 U.S.C. §§ 3729 *et seq.*;

(c) That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

(d) That judgment be entered for Relator and against USDP and DSCC for any costs, including, but not limited to, court costs, expert fees, and all attorneys' fees, costs, and expenses for which Relator necessarily incurred in bringing this case;

41

(e) That pre- and post-judgment interests be awarded;

(f) That the Court grant permanent injunctive relief to prevent any recurrence of the False Claims Act violations for which redress is sought in this complaint;

(g) For such other and further relief as the Court deems just and proper under the circumstances.

## JURY TRIAL DEMANDED

Relator, on behalf of herself and the United States of America, demands a jury trial on all claims alleged herein.

Dated:  May 13, 2020

Respectfully Submitted,

**THE SIMON LAW FIRM, P.C.**

By: */s/ John M. Simon*
John M. Simon, #68393
Anthony G. Simon, MO#38745
800 Market Street, Suite 1700
St. Louis, Missouri 63101
P: (314) 241-2929
F: (314) 241-2029
jmsimon@simonlawpc.com
asimon@simonlawpc.com

*Attorneys for Relator*

42

## <u>VERIFICATION</u>

I declare under penalty of perjury that the foregoing is true and correct. Executed on

May 13 2020.

_Carol Foulds MD_
CAROL FOULDS MD